NOT FOR PUBLICATION (Doc. Nos. 28, 30)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

JAMES FINLEY,

Plaintiff,

v.

CAMDEN COUNTY BOARD OF CHOSEN FREEHOLDERS, et al.,

Defendants.

Civil No. 08-1666 (RBK/KMW)

**OPINION**

**KUGLER**, United States District Judge:

This is a so-called "reverse discrimination" case. Plaintiff James Finley is a Caucasian male who works as a corrections officer for the Camden County Board of Corrections. He alleges that Defendants discriminated against him because of his race by failing to promote him to the rank of sergeant and retaliated against him when he complained about their discrimination. He asserts claims for unlawful discrimination and retaliation under 42 U.S.C. § 1983, 42 U.S.C § 1981, and the New Jersey Law Against Discrimination, N.J. Stat. Ann. 10:5-1 et seq. ("NJLAD"). Presently before the Court are Defendants' motions for summary judgment denying Plaintiff's claims (Doc. Nos. 28, 30). For the reasons discussed below, the Court grants Defendants' motions.

## I. BACKGROUND

The core of Plaintiff's discrimination claim is that between March 2006 and February 2008 he was qualified to be promoted to sergeant but Defendants "passed over" him for other less qualified candidates because he is Caucasian. There were at least four rounds of promotions

between March 2006 and February 2008. Plaintiff claims that the circumstantial evidence surrounding each round of promotions demonstrates that Defendants declined to promote him because of his race. Specifically, Plaintiff claims that Defendants discriminated against him based on his race by systematically promoting less-qualified non-Caucasian candidates. Because the promotion of corrections officers in New Jersey is governed by the New Jersey Civil Service Act, N.J. Stat. Ann. 11A:1-1, et seq. (the "Act"), the Court first summarizes the statutory procedures for promotion and then presents the evidence regarding the four rounds of promotions that form the basis of Plaintiff's claims.

**A. The New Jersey Civil Service Act**

The Camden County Department of Correction ("DOC") is a civil service employer and subject to the Act's procedures for the promotion of civil servants. Pursuant to the Act, when the DOC is prepared to make promotions, it requests a certified list of eligible employees from the Department of Personnel ("DOP"). The DOP generates a list that ranks eligible employees based on an examination administered by the DOP as well as considerations of military service and residency. See N.J. Stat. Ann. § 11A:4-1; N.J. Admin. Code § 4A:4-3.2; N.J. Admin Code § 4A:5-2.2; see also Brown v. State, 279 A.2d 872, 873-74 (N.J. Super. Ct. App. Div. 1971) (holding that the DOP may use a matrix for measuring an applicant's education and experience when tallying the applicant's examination score). The DOP then certifies a list of employees eligible to fill the open position. See N.J Stat Ann. § 11A:4-8. Pursuant to the so-called "rule-of-three," once the DOP certifies a list, the DOP must make the promotion by selecting one of the top three candidates from the list.[1] See N.J. Stat. Ann. § 11A:4-5.

[1] The DOC may elect to not fill the position at all if offers a "valid reason such as fiscal constraints." N.J. Stat. Ann. § 11A:4-5; see In re Code Enforcement Officer, 793 A.2d 839, 841-42 (N.J. Super. Ct. App. Div. 2002). That exception is not at issue here.

"When a single vacancy is to be filled from a promotional certification headed by a nonveteran, any reachable eligible may be appointed in accordance with the 'rule of three.'"[2] N.J. Admin. Code § 4A:5-2.2 (emphasis added). That is, a public employer can "bypass" the top-ranked candidate for the second- or third-ranked candidate "for any legitimate reason based upon the candidate's merit." In re Hruska, 867 A.2d 479, 484-86 (N.J. Super. Ct. App. Div. 2005); see Commn's Workers v. N.J. Dep't of Pers., 711 A.2d 890, 894-95 (N.J. 1998) (explaining the purpose of the rule-of-three as limiting but not eradicating the employer's discretion). If multiple promotions are available, the DOC must fill the first spot by selecting from the top three candidates. (See Dep. of James Blackwell, Def.'s Ex. 50, at 66:3-19). Once the first candidate is selected for promotion, the DOC must "reset" the list by removing the selected candidate from the list and then counting all remaining candidates in order. (Id.). The DOC must repeat that process for each available promotion. (Id.). If the DOC does not promote the top candidate from any given list and "reaches down" to the second- or third-ranked candidate, it must provide a "statement of the reasons why the appointee was selected instead of a higher ranked eligible." See N.J. Admin. Code § 4A:4-4.8(b)(4).

**B. The Warden's Criteria and Procedures for Promotions**

Promotions to sergeant are made by the Warden. (Dep. of Eric Taylor, Def.'s Ex. 49, at 10:12-12:13). Warden Eric Taylor testified that in evaluating candidates for promotion to sergeant, he placed "the most emphasis" on the officer's attendance record. (Taylor Dep. 26:14-27:12). According to the Warden, he clearly communicated to the unions representing the corrections officers before the first set of promotions in March 2006 that "[i]f you came to work, you would get promoted." (Taylor Dep. 17:13-19:5; 27:3-12; 26:14-27:17). The Warden

[2] The Act gives preference to veterans in promotional appointments. See N.J. Stat. Ann. § 11A:4-5 (stating that if a veteran ranks highest on a promotional list, the DOP must promote a veteran).

typically considered an officer's attendance for the two years prior to the date of promotion. (Taylor Cert. ¶ 6). The Warden did not consider leave taken pursuant to the Family Medical Leave Act, 29 U.S.C. § 2901, et seq. ("FMLA"), when evaluating candidates for promotion. (Taylor Dep. 19:6-11).

Regarding the relevance of attendance for promotion, Deputy Warden Walker explained that "[a]ttendance is a vital and essential requirement in a business which requires twenty-four hour coverage." (Def.'s Ex. 68). Deputy Warden Pizarro also emphasized:

> [S]ick time is very important in the Department of Corrections, all right. When an individual misses time, generally – or the vast majority of the time, another corrections officer has to work in their place. Often times a guy [is] working in a diminish[ed] capacity because he's on his second 8 hours. So when you do that, you subject other people to a lot of overtime. When you do it above and beyond or are maxing out your allotted time every year, that's a lot of time.

(Dep. of Anthony Pizarro, Def.'s Ex. 5, at 44:8-18).

The Warden also considered a candidate's disciplinary record, but he considered only disciplinary measures taken in the preceding three years, unless the officer committed an "egregious" offense. (Taylor Dep. 19:12-25:11). The Warden defined "egregious" offense as follows:

> An egregious offense to me for a corrections officer would be any offense that involves an inmate or your duties as a correction officers dealing with inmates – you lost custody of an inmate, you – you were charged with some type of brutality against the inmate. That to me is an egregious charge. You're here to take care of inmates, and that's what I look at.

(Taylor Dep. 24:16-23).

In order to make promotion decisions, the Warden relied on two principal sources of information: (1) a spreadsheet prepared by a Deputy Warden and the human resources

department that summarized attendance and disciplinary information for candidates on the DOC list; and (2) the overall verbal recommendations of a Deputy Warden. (See Blackwell Dep. 42:10-46:6 (summarizing steps taken to prepare spreadsheets for the Warden); Taylor Dep. 15:18-17:7 (stating that the Warden relied on summary spreadsheet in making promotion decisions)). In preparing those spreadsheets, Sergeant Blackwell from the human resources department reviewed each candidate's personnel file and payroll records. The spreadsheets show the number of days in a given year that a candidate was late, the number of "sick" days a candidate took in that year, and any disciplinary measures taken against the candidate. Blackwell did not report absences covered under the FMLA. The Warden did not personally review performance evaluations for purposes of making promotion decisions. (Taylor Dep. 27:18-22). He relied on the human resources sergeant (Sergeant Blackwell) and the Deputy Warden to review performance evaluations when making their overall recommendations to the Warden regarding promotions. (Taylor Dep. 27:23-28:1; 28:18-29:23).

**C. The March 2006 Promotions**

In late 2005, the DOC requested that the DOP certify a list of eligible employees for promotion to sergeant.[3] The list included the following rankings (the Warden promoted the candidates in bold):[4]

| Rank | Name | Race |
|---|---|---|
| 1. | **Rebecca Graeve** | **Caucasian** |
| 2. | James Finley | Caucasian |
| 3. | La Kisha Clement | African-American |

[3] There is some dispute as to when the promotions were actually made. Plaintiff claims that the promotions were made sometime during December 2005. (Dep. of James Finley, Def.'s Ex. 2, at 105:25-106:2). The DOP list includes a notation that it was returned to the DOP with the Warden's promotion choices in March 2006. (See Def.'s Ex. 53). Ultimately, this dispute does not implicate a material issue.

[4] The list does not include a candidate's race. (Def.'s Ex. 53).

| 4. | David Brubaker | -[5] |
|---|---|---|
| 5. | **Lucas Marchiano** | **Caucasian** |
| 6. | **Joseph Connors** | **Caucasian** |

(Def.'s Ex. 53).

After promoting Officer Graeve, Plaintiff was the first-ranked candidate. However, the Warden chose to bypass both Plaintiff and Officer Clement because of attendance and disciplinary concerns. According to the rule-of-three, Officer Brubaker was the only remaining eligible candidate for the second promotion. However, Officer Brubaker withdrew his candidacy because he had tendered his resignation. Thus, the Warden could promote Officer Marchiano and Officer Connors and skip both Plaintiff and Officer Clement without violating the rule-of-three.

The spreadsheet that the Warden used to make the promotion decisions shows the following attendance records for the candidates on the DOP list (promoted candidates are in bold):

| Rank | Name | 2004 Sick Days | 2004 Late Arrivals | 2005 Sick Days | 2005 Late Arrivals |
|---|---|---|---|---|---|
| 1. | **Rebecca Graeve** | 4 | 1 | 5 | 0 |
| 2. | James Finley | 14 | 7 | 12 | 6 |
| 3. | La Kisha Clement | 6 | 6 | 13 | 5 |
| 4. | David Brubaker | 6 | 0 | 2 | 0 |
| 5. | **Lucas Marchiano** | 3 | 2 | 1 | 0 |
| 6. | **Joseph Connors** | 0 | 3 | 2 | 1 |

(Def.'s Ex. 54).

After Plaintiff learned that the Warden had bypassed him for promotion, he requested an administrative conference to discuss the promotions. At the conference, Plaintiff met with Deputy Warden Pizarro because Deputy Warden Simon, who assisted the Warden with

[5] The Court was unable to find evidence of Officer Brubaker's race in the record. The Warden's internal documentation states that in March 2006, Officer Brubaker had tendered his resignation. (See Def.'s Ex. 54).

promotions, was out on FMLA leave. Deputy Warden Pizarro brought certain materials to the meeting regarding Plaintiff's use of FMLA leave during 2005. Deputy Warden Pizarro explained that Plaintiff was not promoted because of his attendance. Plaintiff claims that the Warden improperly bypassed him for promotion in March 2006 because the Warden counted Plaintiff's FMLA leave against his attendance record. Plaintiff does not point to any evidence in support of that proposition other than his own testimony that Deputy Warden Pizarro brought FMLA documentation to the conference.

**D. The March 2007 Promotions**

In March 2007, the DOC received a new list of candidates eligible for promotion to sergeant. The list included the following ranking (promoted candidates are in bold):

| Rank | Name | Race |
|---|---|---|
| 1. | James Finley | Caucasian |
| 2. | La Kisha Clement | African-American |
| 3. | Kevin Kelly | Caucasian |
| 4. | Thomas Crowder | Caucasian |
| 5. | Joseph Whittick | Caucasian |
| 6. | **Reginald Adkins** | **African-American** |
| 7. | Lori Gephart | Caucasian |
| 8. | **Tyefa Stallings** | **African-American** |

(Def.'s Ex. 55).

Both Officers Kelly and Crowder withdrew from consideration. Officer Crowder withdrew only after Lieutenant Farlow asked to meet with him and counseled Officer Crowder that "it might not be the appropriate time . . . to accept a promotion." (Dep. of Crowder, Pl.'s Ex. 10, at 19:9-11). According to Officer Crowder, Lieutenant Farlow explained that Crowder had very little experience as a "floor officer." (Crowder Dep. 19:12-20). Officer Crowder also remembers someone explaining that sergeants are often transferred immediately after their promotion, and Officer Crowder did not want to be transferred because of complications

regarding his childcare responsibilities.[6] (Crowder Dep. 14:6-21:2). Officer Crowder therefore withdrew from consideration. Officer Joseph Whittick was removed from the list because his employment was terminated. Officer Gephart also withdrew from consideration.

Applying the rule-of-three in view of the above withdrawals, the Warden bypassed both Plaintiff and Officer Clement, and promoted Officers Adkins and Stallings. The Warden explained to Plaintiff that he was not promoted because of his attendance and that if Plaintiff improved his attendance, he would be promoted. (Taylor Dep. 32:21-33:7; 49:15-19; 30:25-31:5).

The spreadsheet prepared for the Warden had the following attendance records:

| Rank | Name | 2005 Sick Days | 2005 Late Arrivals | 2006 Sick Days | 2006 Late Arrivals | 2007[7] Sick Days | 2007 Late Arrivals |
|---|---|---|---|---|---|---|---|
| 1. | James Finley | 12 | 6 | 18 | 1 | 6 | 0 |
| 2. | La Kisha Clement | -[8] | - | - | - | - | - |
| 3. | Reginald Adkins | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. | Tyefa Stallings | 8 | 3 | 6 | 9 | 2 | 2 |

(Def.'s Ex. 56).

**E. The June 2007 Promotion**

In March 2007, the DOC received a new list of candidates eligible for promotion to sergeant. Only Plaintiff and Officer Clement appeared on the list. Plaintiff was ranked first and Officer Clement was ranked second. The Warden bypassed Plaintiff and promoted Officer

[6] The general rule in the Third Circuit is that a district court may not consider hearsay statements on a motion for summary judgment. Shelton v. Univ. of Medicine & Dentistry of New Jersey, 223 F.3d 220, 223 (3d Cir. 2000). However, these statements to Officer Crowder are not hearsay statements under Federal Rule of Evidence 801(c). Rule 801(c) provides that hearsay "is a statement . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The above statements are not offered for the truth of the matter asserted but to prove Officer Crowder's state of mind when he withdrew his application for promotion.

[7] The 2007 records cover only January 1, 2007 to March 1, 2007.

[8] The spreadsheet did not contain attendance records for Officer Clement.

Clement. The spreadsheet that Sergeant Blackwell prepared for the Warden shows the following attendance records:[9]

| Rank | Name | 2006 Sick Days | 2006 Late Arrivals | 2007 Sick Days | 2007 Late Arrivals |
|---|---|---|---|---|---|
| 1. | James Finley | 18 | 1 | 7 | 1 |
| 2. | La Kisha Clement | 1 | 0 | 0 | 5 |

(Def.'s Ex. 58). The spreadsheet also stated that Plaintiff had no disciplinary offenses in 2007 but had a minor offense in 2006. Officer Clement had no disciplinary offenses for 2006 and only a "counseling" offense in 2007, which the DOC does not consider a disciplinary offense. (See Taylor Dep. 65:15-24 (explaining Plaintiff and Officer Clement's comparative disciplinary records)).

The Warden testified that he promoted Officer Clement rather than Plaintiff because she had better attendance and disciplinary records than Plaintiff. (Taylor Dep. 65:4-10). Plaintiff asserts that the Warden and the DOC improperly ignored a major disciplinary offense by Officer Clement. In 2004, Officer Clement applied for FMLA leave in order to care for her child. (Taylor Dep. 66:6-23). The Warden investigated her claim and discovered that Officer Clement's child was attending school and not in need of day-time childcare. (Id.). Officer Clement was charged with falsifying FMLA documentation. In 2005, she received a six-month suspension, which was later reduced to three months. The Warden admits knowing about this incident when he promoted Officer Clement and bypassed Plaintiff.

By way of explanation of his choice, the Warden testified that neither candidate had a stellar track record, but the DOP list required him to pick between Clement and Plaintiff. (Taylor Dep. 53:12-54:4). In making his decision, he remembered previously telling both

[9] The spreadsheet also includes information for Officers Kelly, Crowder, and Sydnor. However, those officers were not included on the DOP's certification.

Plaintiff and Officer Clement that if they "clean[ed] up [their] act," they would eventually get promoted. (Taylor Dep. 53:23-54:4). The Warden also remembers telling Officer Clement when she returned from her suspension that he would not consider her for promotion for approximately fifteen months, and, even then, he would promote her only if she improved her attendance and performance during that period. (Taylor Dep. 74:20-77:8). Thus, the Warden chose between Officer Clement and Plaintiff by looking for evidence of improvement in their respective attendance and performance records. (Id.). He determined that Officer Clement had improved more substantially than Plaintiff because she had not been disciplined since her FMLA suspension in 2005[10] and her attendance in 2006 and 2007 was dramatically better than Plaintiff's attendance. (Taylor Dep. 77:11-18).

The Warden also relied on Deputy Warden Simon's recommendation that the Warden promote Officer Clement because she had shown improvement. (Taylor Dep. 78:18-21). Simon explained that in his view the June 2007 promotion was a choice between "the lesser of two evils." (Simon Dep. 17:15-18). He reluctantly recommended Officer Clement over Plaintiff after speaking with both of their supervisors. Clement's supervisors told him that she was improving and taking responsibility for her job. (Simon Dep. 17:5-11). Deputy Warden Simon directly supervised Plaintiff from 2003 to 2005 and he spoke to Plaintiff's supervisors. Plaintiff's supervisors reported that "when he was at work, he was a decent officer, but he hardly came to work."[11] (Simon Dep. 31:21-32:16). Deputy Warden Simon's overall assessment of

[10] Officer Clement committed the FMLA offense in 2004, but she was not disciplined until 2005. Plaintiff claims that because Officer Clement was disciplined in 2005, the offense should have been included in the Warden's three-year "look back" policy for disciplinary measures. The Warden admits that the offense was not included on the spreadsheet prepared by Sergeant Blackwell, but he admits that he was aware of the offense when he promoted Officer Clement.

[11] These statements are not inadmissible hearsay because they are not offered for the truth of the matter asserted. Rather, they are offered to prove Deputy Warden Simon's subjective reasons for recommending Officer Clement for promotion.

Plaintiff was that "when he was there, he was doing a good job . . . . [but] the biggest problem was he was not coming to work." (Simon Dep. 22:16-22). Deputy Warden Simon acknowledged that unlike Officer Clement, Plaintiff did not have any major disciplinary offenses. (Simon Dep. 22:5-13).

Following Officer Clement's promotion, Plaintiff sent a letter to the Camden County Human Resources Department stating:

> Please let this letter be notice that I am still interested in the position of County Corrections sergant [sic]. Let the records show that I have now been passed over for the position on three separate occasions, by five officers with less experience and lower test score rankings.

(Def.'s Ex. 63). Thereafter, on July 9, 2007, Plaintiff sent a letter to the Warden stating:

> I am writing this letter in protest of the recent promotions of Offices [sic]: Adkins, Stallings and Clement to sargent [sic]. This is the third ocassions [sic] that I have been passed over for promotion in favor of officers with less experience and who have scored lower on the civil service promotions test. This is a violation of civil service guidelines. I am requesting an explanation for this injustice. Thank you.

(Def.'s Ex. 64).

On July 16, 2007, Deputy Warden Walker responded to Plaintiff and requested that Plaintiff attend an administrative conference to discuss Plaintiff's concerns. Plaintiff refused to attend a conference and instead demanded "a simple letter stating adminisrations [sic] reasons for skipping me for promotion on three occasions for five officers with less experience and lower test scores (in violation of civil service guidelines)." (Def.'s Ex. 67). Deputy Warden Walker responded with a letter explaining that Plaintiff's poor attendance was the reason he was not promoted. (Def.'s Ex. 68). Deputy Warden Walker emphasized that "attendance is a vital and

essential requirement in a business which requires twenty-four hour coverage." (Id.). Walker also explained that Plaintiff was bypassed consistent with the rule-of-three.

On July 17, 2007, Plaintiff appealed to the DOP. The DOP responded to Plaintiff on August 15, 2007. The DOP stated that the DOC did not violate the rule-of-three by bypassing Plaintiff. The DOP also noted that in bypassing Plaintiff, the DOC had reported that it selected lower-ranked candidates because they had "better recommendations and reviews" and were "better qualified." (Def.'s Ex. 70).

On July 24, 2007, Plaintiff filed a complaint with the State of New Jersey, Division of Civil Rights. The complaint was forwarded to the Warden on July 24, 2007. The complaint asserts for the first time that the DOC discriminated against Plaintiff based on race. The Division of Civil Rights administratively closed the matter when Plaintiff instituted this lawsuit.

### F. The February 2008 Promotions

In January 2008, the DOP certified a list of candidates for promotion to sergeant. (Def.'s Ex. 59). The list included the following rankings (promoted candidates are in bold):

| Rank | Name | Race |
|---|---|---|
| 1. | James Finley | Caucasian |
| 2. | **Kevin Kelly** | **Caucasian** |
| 3. | **Thomas Crowder** | **Caucasian** |
| 4. | Deitra Sydnor | African-American |
| 5. | Raymond Alkins | - |
| 6. | **Harry Sweeten** | **Caucasian** |
| 7. | James Cale | - |
| 8. | Josue Melendez | - |
| 9. | Clifford Kareem | African-American |
| 10. | Jason Ehm | - |

(Def.'s Ex. 59). The Warden again bypassed Plaintiff because of his attendance record. (Taylor Cert. ¶ 6). Consistent with the rule-of-three, the Warden could promote Officer Sweeten because Officer Alkins withdrew his application or he was otherwise not under consideration.

The spreadsheet prepared for the Warden's review regarding the February 2008 promotions included the following:

| Rank | Name | 2006 Sick Days | 2006 Late Arrivals | 2007 Sick Days | 2007 Late Arrivals | 2008[12] Sick Days | 2008 Late Arrivals |
|---|---|---|---|---|---|---|---|
| 1. | James Finley | 18 | 1 | 7 | 1 | 0 | 0 |
| 2. | Kevin Kelly | 9 | 0 | 2 | 0 | 1 | 2 |
| 3. | Thomas Crowder | 1 | 0 | 1 | 0 | 0 | 0 |
| 4. | Harry Sweeten | 0 | 0 | 0 | 0 | 0 | 0 |

(Def.'s Ex. 60). Plaintiff notes that unlike past promotion spreadsheets, the February 2008 spreadsheet did not include a summary of the candidates' disciplinary histories. The spreadsheet also omitted any information regarding Officer Sydnor, who was also bypassed for promotion.

**G. The July 2008 Promotions**

In June 2008 the DOP certified a list of candidates for promotion to sergeant. The list included the following rankings (promoted candidates are in bold):

| Rank | Name | Race |
|---|---|---|
| 1. | **James Finley** | **Caucasian** |
| 2. | **Deitra Sydnor** | **African-American** |
| 3. | Raymond Alkins | - |
| 4. | James Cale | - |
| 5. | Josue Melendez | - |
| 6. | Clifford Kareem | African-American |

(Def.'s Ex. 61). The spreadsheet prepared for the Warden included the following:

| Rank | Name | 2006 Sick Days | 2006 Late Arrivals | 2007 Sick Days | 2007 Late Arrivals | 2008 Sick Days | 2008 Late Arrivals |
|---|---|---|---|---|---|---|---|
| 1. | James Finley | 12 | 8 | 12 | 4 | 0 | 0 |
| 2. | Dietra Sydnor | 6 | 2 | 12 | 11 | 4 | 3 |
| 3. | James Cale | 12 | 1 | 11 | 2 | 6 | 0 |
| 4. | Josue Melendez | 15 | 3 | 11 | 0 | 20 | 0 |
| 5. | Clifford Kareem | 4 | 1 | 1 | 1 | 0 | 0 |

[12] The 2008 records cover only January 1, 2008 to February 8, 2008.

(Def.'s Ex. 62). The spreadsheet also included disciplinary notes for each candidate. The Warden promoted Plaintiff and Officers Kareem and Sydnor. The Warden explained that Plaintiff was promoted because he finally showed improvement in his attendance. (Taylor Cert. ¶ 8).

Plaintiff notes that there is a disparity between his 2006 and 2007 attendance records on the spreadsheet prepared for the February 2008 promotions and the spreadsheet prepared for the July 2008 promotions. With the exception of sick days in 2006, Plaintiff's attendance record was worse on the July 2008 spreadsheet than the February 2008 spreadsheet. Plaintiff also claims that Officer Sydnor, who is African-American and was promoted along with Plaintiff, had an attendance record comparable to Plaintiff's record when he was bypassed for promotions in 2005, 2006, and 2007.

**H. Anecdotal Evidence of Defendants' Alleged Racial Animus**

In 2007, the Warden spoke to Deputy Warden Pizzaro about reports that he had used racial slurs in reference to Caucasians. (Pizarro Dep. 114:17-115:5). The first report claimed that Pizarro described a holiday party attended by mostly white officers as a "redneck Christmas party." (Finley Dep. 28:13-17). Deputy Warden Pizarro denied making the remarks and he was not disciplined. The second report stated that in May 2007, Deputy Warden Pizarro was driving with Captain Ron Barr in a DOC vehicle when Barr accidentally activated the dispatch radio and broadcasted their conversation over county-wide radio. Deputy Warden Pizarro allegedly referred to a Caucasian officer as a "smart ass cracker" and "one of those Klansman." Deputy Warden Pizarro was not disciplined, but Captain Barr was disciplined.

In response to this evidence of Deputy Warden Pizarro's racial animus, Defendants submit evidence that Deputy Warden Pizarro did not have any meaningful involvement in the

promotion decisions. First, Defendants note that Deputy Warden Pizarro never supervised or worked with Plaintiff. Second, the Warden testified that he does not recall Deputy Warden Pizarro having any meaningful involvement in the promotion process. Third, regarding the June 2007 promotions, Deputy Warden Pizarro's opinion was that neither Officer Clement nor Plaintiff should be promoted, but he deferred to Deputy Warden Simon's recommendation.

**I. Plaintiff's Claims**

Plaintiff asserts seven claims against Defendants. Count I asserts a claim against Deputy Wardens Pizarro, Walker, and Simon and Warden Taylor under 42 U.S.C. § 1983 for violation of "Plaintiff's Fourteenth Amendment right to equal protection." Count II asserts a claim against those same individual defendants under 42 U.S.C. § 1983 for violation of "Plaintiff's First Amendment right to free speech." Count III is a separate claim against Warden Taylor for violation of Plaintiff's First Amendment free speech rights. Count IV is a claim for violations of the NJLAD against all Defendants based on race discrimination. Count V is a claim for violations of the NJLAD against all Defendants based on retaliation for Plaintiff's complaints following the July 2007 promotions. Count VI is a claim against the Camden County Board of Chosen Freeholders under 42 U.S.C. § 1981 based on the DOC's alleged racial discrimination in making promotion decisions. Count VII contains many typographical errors in crucial sentences, but it appears to be a claim against the Camden County Board of Chosen Freeholders under 42 U.S.C. § 1981 based on retaliation. All Defendants now move for summary judgment denying Plaintiff's claims.

**II. LEGAL STANDARD**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of

material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, the Court is not to make credibility determinations regarding witness testimony. Sunoco, Inc. v. MX Wholesale Fuel Corp., 565 F. Supp. 2d 572, 575 (D.N.J. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

However, to defeat a motion for summary judgment, the nonmoving party must present competent evidence that would be admissible at trial. See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995). The nonmoving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions [or] conclusory allegations or suspicions" to establish the existence of a genuine issue of material fact. Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (citation omitted); see Fed. R. Civ. P. 56(e). "A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' mandates the entry of summary judgment." Watson v. Eastman Kodak Co., 235 F.3d 851, 857-58 (3d Cir. 2000) (quoting Celotex Corp., 477 U.S. at 322). Thus, if a plaintiff does not oppose a defendant's motion for summary judgment denying the plaintiff's claims, it is proper for the Court to infer that the plaintiff has abandoned the subject claims and enter judgment for the defendant. See Carrier v. City of Plainfield, No. 07-2739, 2009 U.S. Dist. LEXIS 103096, at *26 (D.N.J. Nov. 4, 2009) (entering summary judgment denying plaintiff's claims because plaintiff did not respond to defendant's motion for summary judgment).

## III. DISCUSSION

### A. Plaintiff's Discrimination Claim under 42 U.S.C. § 1981

Count VI asserts that the Camden County Board of Chosen Freeholders discriminated against Plaintiff in violation of 42 U.S.C. § 1981 because the DOC refused to promote him on account of his race.[13]

Section 1981 guarantees the right of all persons in the United States "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981. When a public employee asserts a disparate treatment claim for racial discrimination under § 1981 based on circumstantial evidence, the familiar McDonnell Douglas burden-shifting analysis applies. See Brown v. J. Kaz, Inc., 581 F.3d 175, 181-182 (3d Cir. 2009) (applying McDonnell Douglass analysis to employment discrimination claim under § 1981).

Under the McDonnell Douglas framework, the plaintiff "bears the initial burden of establishing a prima facie case by a preponderance of the evidence." Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (citation omitted). Ordinarily, to establish a prima facie case of disparate treatment under § 1981, a plaintiff must prove:[14] (1) he is within a protected class, (2) "he applied for and was qualified for a job in an available position"; (3) he was rejected for the position; (4) "after the rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications for the

---

[13] To the extent Plaintiff intends to pursue Count VI against the County under both § 1981 and Title VII, the Third Circuit applies the same burden-shifting analysis to employment discrimination claims under § 1981, § 1983, and Title VII. See Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999); Stewart v. Rutgers, State Univ., 120 F.3d 426, 432 (3d Cir. 1997) (applying standard to § 1981 and § 1983 claims); Murphy v. Housing Auth. & Urban Redevelopment Agency, 32 F. Supp. 2d 753, 763 (D.N.J. 1999) (applying standard to Title VII claim).

[14] When analyzing employment discrimination claims against public officials under § 1981, the Third Circuit applies the prima facie case for employment discrimination claims developed under Title VII. Schurr, 196 F.3d at 499 ("In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim.")

position." Marley v. CORT Furniture Rental Corp., No. 06-4926, 2008 U.S. Dist. LEXIS 69383, at *4-5 (D.N.J. Aug. 26, 2008) (citing Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997)).

The Third Circuit has "modified the first element of the prima facie case for discrimination claims brought by non-minorities." Warenecki v. City of Philadelphia, No. 10-1450, 2010 U.S. Dist. LEXIS 116912, at *13-14 (E.D. Pa. Nov. 3, 2010). According to the Third Circuit, "all that should be required to establish a prima facie case . . . is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected." Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1998) (citing United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983). "Thus, in order to establish a prima facie case of employment discrimination . . . , a non-minority plaintiff must show (1) he or she was qualified for the position in question, (2) he or she suffered an adverse employment action, and (3) the evidence is adequate to create an inference that the adverse employment action was based on a trait protected." Warenecki, 2010 U.S. Dist. LEXIS 116912, at *14 (citing Mosca v. Cole, 384 F. Supp. 2d 757, 765 (D.N.J. 2005)).

"After an employee has established a prima facie case, this creates a presumption of discriminatory intent by the defendant-employer." Stewart v. Rutgers, State Univ., 120 F.3d 426, 432 (3d Cir. 1997) (explaining the McDonnell Douglas framework in the context of a § 1983 claim). "The burden then shifts to the defendant to produce evidence that the adverse employment action was taken 'for a legitimate, nondiscriminatory reason.'" Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for

the plaintiff 's rejection, which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action." Id. (internal quotation marks and citations omitted). "If the defendant's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case." Id. (citing Burdine, 450 U.S. at 260 (noting that "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions")). "The burden then falls upon the plaintiff to prove that the 'employer's proffered reason [for the employment action] was not the true reason for the . . . decision' but was instead pretextual." Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993)).

To defeat summary judgment when an employer offers proof of a non-discriminatory reason for its actions

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employers' proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons.

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (internal quotation and alteration marks and citations omitted).

Defendants argue that Plaintiff cannot establish a prima facie case of reverse discrimination because there is no evidence from which a reasonable jury could conclude that Defendants did not promote Plaintiff because of his race. Plaintiff offers five core arguments in support of his claim that Defendants failed to promote him because of his race: (1) "Caucasian employees were bypassed and even asked to withdraw from consideration for the second round of promotions;" (2) Defendants applied more lenient criteria in promoting Officers Clement and

Sydnor, who are both African-American; (3) Defendants promoted African-American officers over Plaintiff in violation of the rule-of-three; (4) Officer "Clement was promised a promotion within a certain time of her suspension, a promise which was kept despite her poor qualifications" and "white employees, such as [Plaintiff], were never offered such promises;" and (5) "Defendants engaged in and tolerated racially offensive remarks made by commanding officers." (Pl.'s Opp'n Br. at 16-17).

As discussed below, the Court finds that Plaintiff fails to present evidence sufficient to establish the third element of a prima facie case of reverse discrimination. That is, Plaintiff does not present evidence from which a reasonable jury could infer that Defendants failed to promote him because of his race.

**1. The March 2006 and 2007 Promotions**

The Court finds that Plaintiff has failed to satisfy his burden of proving a prima facie case of reverse discrimination regarding the March 2006 and March 2007 promotions. Indeed, those promotions strongly support an inference of racial indifference. In March 2006, the Warden bypassed both Plaintiff and Officer Clement (African-American) because of their attendance and disciplinary records, and promoted three Caucasian officers. In March 2007, the Warden again bypassed both Plaintiff and Officer Clement and promoted two African-American officers. In view of the prior promotion of three Caucasian officers and the Warden's bypassing of both a Caucasian and African-American officer in both March 2006 and March 2007, the Court finds that this evidence is alone insufficient to raise any inference that the Warden discriminated based on race when making these promotions.[15]

[15] To be sure, the fact that Defendants did not promote an African-American officer does not require the conclusion that Defendants did not discriminate against Plaintiff because of his race. However, nothing about the March 2006 and March 2007 promotions suggests that Defendants were unlawfully discriminating against Caucasian officers. Thus, Plaintiff fails to satisfy his burden of producing some evidence in support of his claim.

Plaintiff nevertheless argues that Defendants manipulated the March 2007 promotions by causing Officer Crowder (Caucasian) to withdraw, which allowed the Warden to promote lower ranked African-American officers without violating the rule-of-three. However, Officer Crowder testified that Lieutenant Farlow counseled him to withdraw because he was inexperienced as a "floor officer" and because he might be transferred if promoted to sergeant. There is absolutely no evidence that Lieutenant Farlow or any Defendant tried to induce Officer Crowder to withdraw because of his race or any other illegitimate reason. Because the Warden promoted three Caucasian officers in March 2006 and bypassed both a Caucasian and African-American officer in March 2006 and March 2007, there is no basis for inferring that Lieutenant Farlow's advice to Officer Crowder was part of a conspiracy to promote African-American officers over Caucasian officers. Additionally, both Officers Adkins and Stallings had significantly better attendance records than Plaintiff and Officer Clement. Thus, the Court finds that the March 2006 and March 2007 promotions do not give rise to an inference of race discrimination against Plaintiff.

**2. The June 2007 Promotions**

Plaintiff's core argument centers on the promotion of Officer Clement in June 2007 based on the DOP list that certified only Plaintiff and Officer Clement as eligible for promotion. Plaintiff contends that: (1) because he was a better candidate than Officer Clement, a jury could infer that Defendants discriminated against him based on race when they promoted Officer Clement; and (2) Defendants manipulated attendance and disciplinary information to ensure that Officer Clement was promoted over Plaintiff. To support Plaintiff's claim that he was a better candidate for sergeant, Plaintiff notes that he scored higher on the DOP exam, Officer Clement was suspended for three months for falsifying FMLA documentation, and Officer Clement had a

poor attendance record. To support the claim that Defendants' manipulated attendance and disciplinary information, Plaintiff claims that Officer Clement's attendance as reflected on the spreadsheets does not match her performance evaluations and that the Warden did not consider Officer Clement's suspension for falsifying FMLA leave.

An inference of racial discrimination can arise if a plaintiff demonstrates that a candidate was rejected and a less-qualified candidate of a different race was selected.[16] See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003). However, the existence and strength of this inference depends on the magnitude of the disparity between the two candidates' qualifications. If the rejected candidate is "clearly" better qualified than the promoted candidate, a sound inference of racial discrimination may arise. See EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1444 (5th Cir. 1995) ("A fact finder can infer pretext if it finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected."). On the other hand, if the disparity between the two candidates is negligible, an inference of racial discrimination may not arise. See id. at 1445-46 (rejecting inference of prejudice where the rejected candidate was not "clearly better" than the chosen candidate); Odom v. Frank, 3 F.3d 839, 847 (5th Cir. 1993) (holding that disparity in qualifications must "jump off the page and slap us in the face" to sustain an inference of prejudice). In other words, when two candidates are similarly qualified, an employer's selection of one candidate over the other does not alone create an inference of racial discrimination. See Odom, 3 F.3d at 847.

---

[16] The Court of Appeals for the District of Columbia has explained the justification for this inference as follows:

> A rational employer can be expected to promote the more qualified applicant over the less qualified, because it is in the employer's best interest to do so. And when an employer acts contrary to his apparent best interest in promoting a less-qualified minority applicant, it is more likely than not that the employer acted out of a discriminatory motive.

Harding v. Gray, 9 F.3d 150, 153-54 (D.C. Cir. 1993).

The record demonstrates that Plaintiff was not better significantly better qualified than Officer Clement, and Defendants' promotion of Officer Clement does not create an inference of racial discrimination. First, regarding the civil service exam, Plaintiff and Officer Clement were ranked second and third respectively. Not only is that disparity minor, but New Jersey courts have repeatedly emphasized that under the New Jersey Civil Service Act, test scores do not entitle public employees to automatic promotion because they are only one of many legitimate criteria that a public employer may use when selecting between the top three eligible candidates. See Terry v. Mercer County Bd. of Chosen Freeholders, 430 A.2d 194, 198-99 (N.J. 1981) (holding that rule-of-three is intended to limit but not eradicate a public employers discretion); Marranca v. Harbo, 197 A.2d 865, 869 (N.J. 1964) ("The statute does not provide that the highest on the employment list must be selected or that the choice shall rest with Civil Service"); In re Crowley, 473 A.2d 90, 97-98 (N.J. Super. Ct. App. Div. 1984) (holding that test scores do not entitle a candidate to a position but only require the public employer to choose a candidate consistent with the rule-of-three). Indeed, the New Jersey Supreme Court has observed that it "is difficult to evaluate the character, industry, personality, and responsibility of an applicant from his performance on a written examination." Cammarata v. Essex County Park Com., 140 A.2d 397, 401 (N.J. 1958). Thus, Plaintiff's nominally better ranking on the civil service exam does not establish that he was better qualified for promotion to sergeant or that he was entitled to the promotion. See Communications Workers v. N.J. Dep't of Pers., 711 A.2d 890, 894 (N.J. 1998). As the Warden explained, consistent attendance was a vital attribute for promotion and, of the two candidates, Officer Clement demonstrated the most improved attendance record.

Second, Plaintiff argues that Officer Clement had a worse disciplinary record than Plaintiff because she was suspended for falsifying FMLA documentation in 2005. However,

Plaintiff conveniently ignores that he had his own disciplinary troubles in 2005 related to attendance. In June 2005, Captain Ron Barr issued a Supervisor's Staff Complaint Report recommending that Plaintiff be disciplined for perpetual poor attendance. (Def.'s Ex. 36). Plaintiff did not initially dispute the charges and a fine was issued. Plaintiff then appealed the fine to the DOC, but the Warden upheld the fine. Plaintiff filed an action in lieu of prerogative writ with the Superior Court of New Jersey challenging the fine. The court upheld the fine and dismissed Plaintiff's complaint. Plaintiff also received three counseling reports regarding his attendance in 2005. Although falsification of FMLA documentation is certainly a serious offense, Plaintiff's own disciplinary record was not "clearly" better than Officer Clement's record such that an inference of discrimination arises.

Regarding the accuracy of Officer Clement's attendance record, Plaintiff and Officer Clement's respective performance evaluations reveal the following attendance for the three evaluation periods prior to Officer Clement's promotion:

| | **2004-2005**[17] | **2005-2006** | **2006-2007**[18] |
|---|---|---|---|
| **Plaintiff** | 7 Late Arrivals<br>12 Sick Days | 3 Late Arrivals<br>14 Sick Days | 0 Late Arrivals<br>22 Sick Days |
| **Clement** | 5 Late Arrivals<br>19 Sick Days[19]<br>3 AWOL | 4 Late Arrivals<br>3 Sick Days[20] | 5 Late Arrivals<br>0 Sick Days[21] |

Plaintiff does not dispute the accuracy of these evaluations. (Pl.'s Opp. Br. at 7). Although there are some discrepancies between the evaluations and the Warden's spreadsheets, the

[17] Plaintiff's evaluations period ran from March to March. Officer Clement's evaluation period ran from August to August.

[18] Plaintiff's evaluation period ran from March to March. Officer Clement's last evaluation before her promotion ran from January 1, 2007 to June 30, 2007.

[19] This number does not include the nine days of FMLA leave that Plaintiff took.

[20] This number does not include the fourteen days of FMLA leave that Plaintiff took.

[21] This number does not include the twelve days of FMLA leave that Plaintiff took.

evaluations actually contradict Plaintiff's claim that Officer Clement had "far greater absenteeism" than Plaintiff. Officer Clement's sick days show a dramatic improvement between her 2004-2005 evaluation and her 2006-2007 evaluation. Indeed, Officer Clement's 2004-2005 evaluation reported her "promotional potential" as "poor (do to sick time and AWOL's)." (Pl.'s Ex. 4). However, as her attendance improved, so did her supervisor's evaluation of her promotional potential. Her 2005-2006 evaluation listed her potential as "very good," and her 2006-2007 evaluation listed it as "good." (Pl.'s Exs. 44, 45). Plaintiff's attendance record, on the other hand, worsened over time. Plaintiff's 2007 evaluation, which covered the year before Officer Clement was promoted and during which Plaintiff took twenty-two sick days, was listed as "good" provided that Plaintiff demonstrate "improved sick time." (Def.'s Ex. 46). Thus, even if the Court relies on the evaluations rather than the Warden's spreadsheets, the evidence does not suggest that Officer Clement's attendance record was worse than Plaintiff's when she was promoted in 2007. In fact, the evidence suggests the opposite.

Plaintiff also argues that the disparities between the Warden's spreadsheets and the evaluations create an inference of discrimination because they suggest that Defendants manipulated the records to ensure that African-American candidates were promoted over Caucasian candidates. That argument is misguided. Sergeant Blackwell testified that he prepared the Warden's spreadsheet by reference to the payroll records for the calendar year. (Blackwell Dep. 46:18-22). The performance evaluations, on the other hand, cover a twelve-month period that does not follow the calendar year. The Warden's spreadsheets show that Plaintiff had eighteen sick days during the 2006 calendar year. Plaintiff's 2005-2006 evaluation, which covered March 14, 2005 to March 14, 2006, states that Plaintiff had fourteen sick days, and Plaintiff's 2006-2007 evaluation, which also ran from March to March, shows that Plaintiff

had twenty-two sick days. Because these reports cover different time-periods, they are not necessarily inconsistent, and, therefore, do not support an inference of discrimination. Moreover, as discussed above, under both the spreadsheets and the evaluations, Officer Clement had a better attendance record than Plaintiff leading up to the promotion. Thus, there is no basis to conclude that discrepancies between the evaluations and spreadsheets are evidence of a conspiracy to discriminate against Caucasian officers.

Plaintiff's argument that the Warden "promised" Officer Clement a promotion within a certain time period is also fallacious. The Warden testified that after Officer Clement was suspended in 2005 for falsifying FMLA documentation, she met with him to discuss the impact of her conduct on being promoted. (Taylor Dep. 74:20-77:20). The Warden told her that in light of her suspension she could "not get promoted for a while." (Taylor Dep. 74:16). The Warden told her that it would be at least a year-and-a-half before he would "look at whether or not [he] can promote [her]." (Taylor Dep. 74:17-18). After that time, the Warden said that he would consider her for promotion if she improved her attendance and disciplinary record. (Taylor Dep. 77:21-78:4). The Warden also testified that Plaintiff was given the same opportunities for promotion because he had a standing opportunity to improve his attendance. In the Warden's own words: "With Finley, it's just a matter of you come to work for a period of time, you're going to get promoted." (Taylor Dep. 78:5-6). However, as the above discussion demonstrates, Plaintiff's attendance record worsened over time while Officer Clement's record improved. Thus, the Court rejects Plaintiff's argument that the Warden's willingness to consider Officer Clement for a promotion a year-and-a-half after her suspension creates an inference of discrimination. Indeed, Officer Clement's promotion supports the inference that, regardless of race, the Warden promotes eligible officers who improve or maintain good attendance.

**3. The February 2008 Promotions**

The February 2008 promotions do not support an inference of discrimination. Consistent with the rule-of-three, the Warden bypassed Plaintiff and promoted the second, third, and sixth-ranked officers (all Caucasian). The fourth-ranked officer (Dietra Sydnor), who the Warden also bypassed, was African-American. The February 2008 promotions, standing alone, do not support an inference of discrimination against Caucasians.

**4. The July 2008 Promotions**

In July 2008, the Warden promoted Plaintiff and two African-American officers, including Dietra Sydnor. Plaintiff argues that the July 2008 promotions support an inference of discrimination because: (1) the Warden's spreadsheet contains different attendance data for Plaintiff than the spreadsheet used for the February 2008 promotions; and (2) the Warden did not apply the same strict standards to Officer Sydnor's application that he applied to Plaintiff's previous applications.

Plaintiff's first argument is misguided. The alleged discrepancies in attendance do not suggest that the Warden was discriminating against Plaintiff based on race. The spreadsheet for the February 2008 promotions shows that Plaintiff had eighteen sick days in 2006 and seven sick days in 2007. The spreadsheet for the July 2008 promotions shows that Plaintiff had twelve sick days for 2006 and twelve sick days for 2007. Thus, the July 2008 spreadsheet shows less sick days for 2006 but more sick days for 2007. Because those discrepancies go in different directions, they do not suggest that Defendants were intentionally manipulating Plaintiff's attendance records in order to discriminate against him based on race.

Plaintiff's second argument is also unavailing. The Warden's promotion of Officer Sydnor does not in and of itself support an inference of racial discrimination. At the time of

Officer Sydnor's promotion, her attendance record was comparable to or better than Plaintiff's attendance record. Plaintiff had twelve sick days and two late arrivals in 2006. Officer Sydnor had only six sick days and two late arrivals in 2006. In 2007, both Plaintiff and Officer Sydnor had twelve sick days.[22] Plaintiff had four late arrivals in 2007 and Officer Sydnor had eleven. In 2008, Plaintiff improved his attendance. He had no late arrivals and no sick days as of June 2008. Officer Sydnor had four sick days and three late arrivals by that time. The Court does not find any meaningful disparity between Plaintiff's attendance and Synor's attendance sufficient to give rise to an inference of discrimination against Plaintiff based on his race.[23] See Odom, 3 F.3d at 847 (holding that disparity in qualifications must "jump off the page and slap us in the face" to sustain an inference of prejudice).

**5. Deputy Warden Pizarro's Remarks**

Plaintiff's final argument is that Deputy Warden Pizarro's purported use of racial slurs creates an inference that Defendants discriminate based on race.

The Third Circuit has held that "comments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination." Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997). "'Stray remarks. . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.'" Fuentes v. Perskie, 32 F.3d at 767 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).

[22] Plaintiff had only seven sick days in 2007 according to the February 2008 spreadsheet.

[23] Plaintiff notes that the Warden does not appear to have considered Officer Sydnor's disciplinary record when promoting her. However, Officer Sydnor's disciplinary record does not include any "egregious offenses," and, as noted above, the Warden clearly communicated that attendance was the primary criterion for promotion. Thus, the Warden's promotion of Officer Sydnor notwithstanding her disciplinary record does not support an inference of discrimination against Plaintiff because of his race.

Here, the Court finds that Deputy Warden Pizarro's remarks are alone insufficient to create an inference of race discrimination against Plaintiff. First, there is no evidence that the Warden relied on any input from Deputy Warden Pizarro in making promotions decisions. Plaintiff admits that he does not know of any facts to support the claim that Deputy Warden Pizarro "had anything to do with [Plaintiff] being skipped over for promotion." (Finley Dep. 18:16-22). The Warden also testified that he did not recall Deputy Warden Pizarro being involved in the March 2006, March 2007, or June 2007 promotions. (Taylor Dep. 85:20-24). Indeed, the Warden testified that he relied on Deputy Warden Simon's "judgment" in making promotion decisions, (Taylor Dep. 89:3-1), and Deputy Warden Pizarro testified that he deferred to Deputy Warden Simon regarding promotions, (Pizarro Dep. 36:23-37:2). Even after Deputy Warden Pizarro replaced Deputy Warden Simon as Deputy Warden of Administration in April 2008, the Warden testified that he does not recall Deputy Warden Pizarro having any involvement in the July 2008 promotions. (Taylor Dep. 89:22-90:2). There is simply no evidence that Deputy Warden Pizarro was involved in promotion decisions in any meaningful way.[24]

Second, Plaintiff argues that Deputy Warden Pizarro's remarks are evidence of pervasive racial animus towards Caucasians within the DOC. However, Deputy Warden Pizarro's alleged statements are contrary to all other indicia regarding the DOC's decision making. As discussed above, the Warden has a demonstrated history of promoting both Caucasian and minority candidates regardless of race. Additionally, the aggregate racial composition of the prison staff does not suggest that Deputy Warden Pizarro's comments are representative of the overall

---

[24] Plaintiff notes that Deputy Warden Pizarro met with Plaintiff regarding the March 2006 promotions. However, Deputy Warden Pizarro met with Plaintiff only because Deputy Warden Simon was on FMLA leave. Notwithstanding that Deputy Warden Pizarro "covered" for Deputy Warden Simon while he was away, there is no evidence that Deputy Warden Pizarro was involved in the March 2006 promotion decisions.

management of the prison. According to the DOC's 2008 EEOC report, 133 of the DOC's 256 officers are Caucasian. (Pl.'s Ex. 3). Of the 30 sergeants at the DOC, 26 are Caucasian. (Id.). Moreover, there is no evidence that the Warden or any person involved in the decision-making process made any improper racial comments. Thus, there is no support for Plaintiff's argument that Deputy Warden Pizarro's comments reflect pervasive animus toward Caucasians within the DOC.

Notwithstanding the inexcusable nature of Deputy Warden Pizarro's alleged remarks, those comments, standing alone, do not support the inference that the DOC discriminated against Plaintiff because of his race.

**B. Plaintiff's Discrimination Claim under 42 U.S.C. § 1983**

Count I of the Complaint asserts a claim under § 1983 based on Plaintiff's allegation that the individual Defendants discriminated against him in violation of the Equal Protection Clause by failing to promote him because of his race.[25]

Section 1983 "governs the relationship between state officials and individuals." Schanzer v. Rutgers Univ., 934 F. Supp. 669, 678 (D.N.J. 1996). It provides a civil cause of action against

---

[25] Count I also alleges that the "decision not to give plaintiff the promotion he sought in 2007 was the result of intentional discrimination on the basis of plaintiff's race and constituted a violation of plaintiff's federal civil rights as guaranteed by Title VII." (Compl. ¶ 39). Count I asserts a claim against the individual defendants in their individual capacities. However, Title VII provides a cause of action only against "employers." See 42 U.S.C. § 2000e-2. Title VII does not provide a claim against individual employees in their individual capacities. See Schanzer v. Rutgers Univ., 934 F. Supp. 669, 678 (D.N.J. 1996). Nor does Title VII "permit official-capacity claims against non-employer individuals." Mitchell v. N.J. Lottery, No. 04-896, 2006 U.S. Dist. LEXIS 32559, at *23 (D.N.J. May 15, 2006). Thus, as a matter of law, Plaintiff cannot bring a Title VII claims against the individual defendants and the Court construes Count I as asserting only a § 1983 claim against the individual defendants based on alleged violations of Plaintiff's Fourteenth Amendment Equal Protection rights.

Additionally, Count I alleges that by "retaliating against [P]laintiff after he complained about discrimination, Defendants violated Plaintiff's right to Equal Protection as guaranteed by the Fourteenth Amendment." (Compl. ¶ 44). However, "a claim for retaliation, which was created by Title VII and is not recognized under constitutional principles, may not be pursued through Section 1983." Bair v. City of Atlantic City, 100 F. Supp. 2d 262, 267 n. 3 (D.N.J. 2000) (citations omitted). Thus, to the degree Plaintiff asserts a claim for retaliation under § 1983, that claim is dismissed as a matter of law. See Hanani v. New Jersey, No. 03-3111, 2005 U.S. Dist. LEXIS 43969, at *22-23 (D.N.J. May 25, 2005).

state officials who, acting under color of state law, violate a plaintiff's federal rights. See 42 U.S.C. § 1983. Thus, a public employee may bring a claim for employment discrimination under § 1983 based on a public official's violation of the Equal Protection Clause of the Fourteenth Amendment. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990) (holding that a public employee could bring a race discrimination employment claim under § 1983 based on violations of the Equal Protection Clause); Hanani v. N.J. Dep't of Envtl. Prot., 205 F. App'x. 71, 78 (3d Cir. 2006) (noting that a public employee could assert a claim against individual officials for employment discrimination under § 1983).

"Plaintiffs alleging claims of racial discrimination under § 1983 must make a showing similar to, but distinct from, the showing required for race discrimination claims brought under either § 1981 or Title VII." Peace-Wickham v. Walls, 2010 U.S. App. LEXIS 26004 (3d Cir. Dec. 21, 2010). A plaintiff must prove that the individual defendant intentionally discriminated against him on the basis of race. Id. "Claims that a supervisor participated in alleged discriminatory behavior must be supported by evidence of personal involvement by the supervisor, or evidence that the supervisor possessed actual knowledge of the discriminatory behavior of others and acquiesced to their improper conduct." Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995).

Thus, to succeed on Count I, Plaintiff must present sufficient evidence for a facfinder to conclude that each individual Defendant intentionally discriminated against him on the basis of race. The generalized showing of discrimination required under § 1981 for a claim against a public employer is alone insufficient to sustain a claim against individual public officials under § 1983. Id. Plaintiff must present evidence of intentional discrimination on the part of each individual Defendant.

Plaintiff sued the Warden and Deputy Wardens Simon, Pizarro, and Walker under § 1983. As noted above regarding Plaintiff's § 1981 claim, there is no evidence that the Warden, Simon, or Walker discriminated against Plaintiff because of his race when making promotion decisions. Regarding Deputy Warden Pizarro, although his comments may be evidence of racial animus on his part, there is no evidence that Deputy Warden Pizarro was involved in any of the promotion decisions. In other words, even if Deputy Warden Pizarro's comments could suggest that he would have discriminated against Plaintiff because of his race, there is no evidence that he actually discriminated against Plaintiff. Thus, Plaintiff fails to present evidence sufficient to survive summary judgment regarding his Equal Protection claim against Defendants Taylor, Simon, Pizarro, and Walker.

**C. Plaintiff's NJLAD Discrimination Claim**

Count IV asserts a claim for employment discrimination under the NJLAD against all Defendants based on their failure to promote Plaintiff. Although employment discrimination claims under the NJLAD ordinarily parallel corresponding federal discrimination laws, see Wise v. Estes, No. 10-481, 2010 U.S. Dist. LEXIS 66727, at *13 (D.N.J. July 1, 2010), New Jersey applies a difference standard to reverse race discrimination claims under the NJLAD, see Oakley v. Wianecki, 784 A.2d 727, 731 (N.J. Super. Ct. App. Div. 2001). To establish a prima facie claim for reverse discrimination under the NJLAD, a Plaintiff "is required to show some reason to believe that his employer is the 'unusual employer who discriminates against the majority.'" Oakley, 784 A.2d at 732 (quoting Erickson v. Marsh & McLennan Co., 569 A.2d 793, 799-800 (N.J. 1990)); see Bergen Commer. Bank v. Sisler, 723 A.2d 944, 957 (N.J. 1999). A plaintiff may satisfy that standard by presenting evidence of "'background circumstances' suggesting an unusual discriminatory environment." Bergen Commer. Bank, 723 A.2d at 957.

Although the NJLAD applies a different standard to reverse discrimination claims, the Third Circuit has recognized that the "background circumstances" standard is usually more exacting than the Third Circuit's standard for reverse discrimination claims. See Iadimarco v. Runyon, 190 F.3d 151, 158-161 (3d Cir. 1999). Indeed, in Iadimarco, the Third Circuit rejected the "background circumstances" standard for purposes of applying federal anti-discrimination laws to reverse discrimination cases because the Third Circuit concluded that it improperly raised the bar for plaintiffs in proving a prima facie case of discrimination. Id. at 160-61. Moreover, the parties cite no authority for the proposition that the New Jersey's "background circumstances" standard is more lenient than the Third Circuit's reveries discrimination standard. Thus, the Count concludes that, at the very least, the two standards are parallel, and, because Plaintiff fails to satisfy the federal standard, he necessarily fails to satisfy the NJLAD standard. Indeed, as discussed above, the evidence include any "background circumstances" suggesting that Defendants are the usual employer who discriminates against the majority. See Oakley, 784 A.2d at 732 (dismissing reverse discrimination claim because of absence of background circumstances suggesting discrimination).

**D. Plaintiff's First-Amendment Retaliation Claims**

Counts II and III assert § 1983 claims for violation of Plaintiff's right to free speech under the First Amendment. Plaintiff claims that Defendants retaliated against him when he complained in July 2007 about their failure to promote him because of his race.

The Third Circuit applies a "three-step burden-shifting analysis when examining a public employee's § 1983 claim of retaliation for engaging in activity protected under the First Amendment." Nead v. Union County Educ. Servs. Comm'n, 378 F. App'x. 175, 177 (3d Cir. 2010). "First, the employee must show that the activity is in fact protected. Second, the

employee must show that the protected activity 'was a substantial factor in the alleged retaliatory action.' Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (citations omitted). "When there is more than one defendant, the employee must show that each defendant individually participated or acquiesced in each of the alleged constitutional violations." Smith v. Cent. Dauphin Sch. Dist., 355 F. App'x. 658, 667 (3d Cir. 2009) (citing C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005)).

Regarding the first step, "[a] public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (internal quotation marks and citation omitted). "Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern." Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994).

Regarding the second step, a court must first "examine the complained of acts and determine whether they are sufficient to give rise to a First Amendment retaliation claim." Smith v. Cent. Dauphin Sch. Dist., 355 F. App'x. 658, 668 (3d Cir. 2009). Failure to promote an otherwise qualified employee satisfies this test. Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 320 (3d Cir. 2008). Second, "courts must examine whether the employee's speech was a substantial or motivating factor for the alleged acts." Id. The Third Circuit has held:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof, the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

Lauren v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Plaintiff argues that Defendants retaliated against him following his complaints regarding the June 2007 promotions. Thus, Plaintiff must present evidence that Defendants failed to promote him in February 2008 because of his complaints. Plaintiff argues that he meets this burden because the promotion of other Caucasian candidates with lower test scores in February 2008 proves that Defendants bypassed him on account of his complaints. Plaintiff also argues the discrepancies in the spreadsheets regarding his attendance records prove Defendants' retaliatory motive.

Plaintiff does not present evidence from which a reasonable jury could conclude that Defendants retaliated against him. First, the officers promoted in February 2008 had significantly better attendance records than Plaintiff. Indeed, Officer Sweeden did not have a single sick day or late arrival for 2006, 2007, or 2008. Officer Crowder had only one sick day and one late arrival for all of 2006, 2007, and 2008. Officer Kelly had nine sick days and no late arrivals in 2006, two sick days and no late arrivals in 2007, and only one sick day and two late arrivals in 2008. Thus, the Warden's promotion of those officers supports the conclusion that the Warden faithfully applied his stated policy of promoting officers with the best attendance as permitted by the rule-of-three.

Second, as noted above, the discrepancies in Plaintiff's attendance do not provide any evidence of deliberate discrimination against Plaintiff because they increase and decrease his

sick days and late arrivals. The discrepancies are indicative of a clerical or computational error, not a systemic conspiracy theory to retaliate or discriminate against Plaintiff. Thus, Plaintiff does not present sufficient evidence to survive summary judgment regarding his First Amendment retaliation claim.

**E. Plaintiff's NJLAD Retaliation Claim**

To succeed on a claim for retaliation under the NJLAD, a plaintiff must first present evidence sufficient to prove all of the following prima facie elements of retaliation: "(1) [plaintiff] engaged in a protected activity known by the employer; (2) thereafter [the] employer unlawfully retaliated against [her]; and (3) [her] participation in the protected activity caused the retaliation." Tartaglia v. UBS PaineWebber, Inc., 961 A.2d 1167, 1192 (N.J. 2008) (internal quotation marks and citations omitted).

For the same reasons discussed above regarding Plaintiff's First Amendment retaliation claims, Plaintiff does not present evidence sufficient to prove the third element of a NJLAD retaliation claim. There is no evidence that Plaintiff's complaints following the June 2007 promotions caused the Warden to bypass Plaintiff for promotion in February 2008. Plaintiff was bypassed because of his perpetual attendance problems and because other candidates with qualifying test scores had superior attendance records.

**F. Plaintiff's § 1981 Retaliation Claim**

As with a First Amendment retaliation claim under § 1983, to succeed on a retaliation claim under § 1981, a plaintiff must prove, among other things, that "the protected activity was a substantial or motivating factor in the alleged retaliatory action." Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996) (citation omitted). As noted above, Plaintiff cannot prove that the Warden bypassed him for promotion in February 2008 because of his complaints.

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is granted.

An appropriate Order shall enter today.

Dated: 6/20/2011

/s/ Robert B. Kugler
ROBERT B. KUGLER
United States District Judge